**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**


| | |
|---|---|
| **DAVID L. MINGER**, | Case No. 3:14-cv-01460-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **HOOD COMMUNITY COLLEGE DISTRICT**, operating as **MOUNT HOOD COMMUNITY COLLEGE**; **MICHAEL HAY**; and **CHRISTIE PLINSKI**, | |
| Defendants. | |


Craig A. Crispin and Shelley D. Russell, CRISPIN EMPLOYMENT LAWYERS, 1834 SW 58th Ave., Suite 200, Portland, OR 97221. Of Attorneys for Plaintiff.

Barrett C. Mersereau, THE LAW OFFICE OF BRETT MERSEREAU, 851 SW Sixth Ave., Suite 1500, Portland, OR 97204. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Plaintiff David L. Minger ("Minger" or "Plaintiff") brings three claims against his former employer, Defendant Mount Hood Community College ("MHCC"), the former President of MHCC, Defendant Michael Hay ("Hay"), and Minger's former colleague Defendant Christie Plinski ("Plinski") (collectively "Defendants"). Minger alleges that Defendants committed the following violations: (1) MHCC retaliated against him in violation of Oregon Revised Statutes

("ORS") § 659A.199 and § 659A.203; (2) MHCC discriminated against him based on sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") 42 U.S.C. § 2000e-2, and ORS § 659A.030; and (3) all Defendants deprived him of his right to Equal Protection under the Fourteenth Amendment in violation of 42 U.S.C. § 1983.[1] Defendants move for summary judgment on all three claims. For the reasons that follow, the Court denies summary judgment on the retaliation claim under ORS § 659A.203 and grants summary judgment on all other claims.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

---

[1] On November 23, 2015, the Court granted Minger's motion to voluntarily dismiss his claims for retaliation in violation of 42 U.S.C. § 2000e-3 and ORS § 659A.030(1)(f), protected medical leave interference, wrongful discharge, and intentional interference with economic relations.

# BACKGROUND

Minger alleges that Hay eliminated Minger's position at MHCC because Minger reported allegedly "bullying" behavior by Plinski. Defendants respond that MHCC eliminated Minger's position due to ongoing budget cuts at MHCC, but according to Minger, when MHCC eliminated female employees' positions, the college usually reassigned them to another position rather than terminating the female employees permanently. Minger argues that MHCC refused to reassign him because he is male and that MHCC's actions constitute unlawful gender discrimination. Regarding these allegations, the following facts are supported by the record and presented in the light most favorable to Minger, the non-moving party.

## A. Efforts to Balance the Budget at MHCC

Hay served as President of MHCC from July 1, 2011, to June 30, 2013.[2] When Hay assumed the office of President, MHCC faced a budget deficit of as much as $7.8 million in total for the fiscal years of 2012-2013 and 2013-2014. The college charged Hay with delivering a balanced budget to MHCC's Board of Directors.

Surveys of the MHCC community showed that students, faculty, and employees felt that MHCC spent too much on administration and had too many vice presidents. In response to the surveys, Hay, serving as interim president, sent a letter to the MHCC community on April 18, 2011. The letter stated that budget cuts would include a "reduction of Vice President positions and Dean positions" that would "lead to a redesign of the administrative structure and a redistribution of responsibilities among both the President's Cabinet, existing staff, and Instructional Administrators." Dkt. 29-4 at 4. The letter emphasized that the redesign was "still under development." *Id.*

---

[2] Hay served as interim president from March 11 to July 1, 2011.

In May of 2012, Hay estimated that fixed personnel costs made up approximately 75 percent of MHCC's budget. Dkt. 29-2 at 2. Hay identified some of the vice president positions created by former President Sygielski as potential sources of savings for MHCC.[3] Hay and his team of advisors set a goal of achieving 30 percent (approximately $2.3 million) of the total required budget cuts through administrative reductions.

B.  **Minger's Interactions with Plinski**

Minger worked as a paid employee at MHCC from January 2010 to July 5, 2013. He served as Vice President of Student Success and Enrollment Management, charged with, among other duties, ensuring that MHCC met accreditation standards, overseeing the student judicial and conduct system, and hearing student appeals regarding accessibility concerns. During Minger's employment with MHCC, Plinski served as Vice President of Instruction. Minger's and Plinski's departments collaborated on various projects, including Agilegrad, an online student advising system. Hay believed Minger and Plinski had "a difference of professional opinion about the product [Agilegrad]." Dkt. 40-2 at 10.

Minger testified that he had "conflict" with Plinski. Dkt. 40-1 at 6. According to Minger, this conflict took the form of "ongoing putdowns, exclusion, cold shoulder treatment, different types of rudeness. It was—ongoing treatment that was having a—quite an effect on [him]." Dkt. 40-1 at 6. Minger testified that he did not receive "respectful collaboration and communication" from Plinski. *Id.* at 7. Minger further testified that Plinski "would intentionally avoid any direct addressing of [him] or eye contact with [him]," referred to the people who reported to Minger as "little people," and admitted that "she had been deliberately roadblocking [him] on getting [his] job done." *Id.*

_____

[3] President John Sygielski expanded the number of vice president-level positions at MHCC from two to six.

In August 2012, Gale Blessing, the Affirmative Action Officer, questioned Minger about Plinski. Ms. Blessing requested that Minger complete an intake questionnaire form on August 3, 2012, but Minger did not fill out the questionnaire. Minger testified that, at the time, he did not think he should fill out any written report because he was not one of "the initiators" of the complaint against Plinksi.[4] On August 14, 2012, Ms. Blessing met with Minger to question him about the conflict with Plinski. Minger told Ms. Blessing that Plinski was "difficult to work with at times" but that he did not consider her a "bully." Dkt. 40-3 at 32. When asked at deposition if he believed, in August 2012, that Plinski was not a bully, Minger testified:

> I was trying to be as hopeful as I could be. And I also make a distinction between calling someone a bully, when all I know is a slice of their personality. While I would not have called Christie Plinski a bully at that point in time, had Miss Blessing said, 'Do you think she's engaged in any bullying behaviors,' I would have said, 'Yes, but I'm hopeful that we can resolve this.'

Dkt. 40-1 at 9.

On February 28, 2013, Plinski reported Minger's conduct to Hay. In an email to Hay, Plinski stated her belief that Minger had "intent to undermine [her]" and referenced an email in which Minger accused her of making "snide" comments. Dkt. 40-3 at 8. Additionally, Plinski wrote, "I am feeling bullied and called out in public." *Id.*

On March 3, 2013, Minger sent an email to MHCC employee Travis Brown about Plinski. Minger wrote that he received "down-putting and off-putting communications" from

---

[4] In Minger's response to Defendants' motion for summary judgment, he asserts that he denied involvement in the complaint because he feared retaliation from Plinski and others. Dkt. 38 at 4. In the portions of Minger's deposition submitted with the parties' filings, however, Minger stated that he did not fill out a complaint because he was not one of "the initiators." Dkt. 40-1 at 8. When asked why he might want Hay to think that he had not filed a complaint, Minger answered, "Because I had not." Dkt. 40-1 at 6. When asked why it was important that Hay know that Minger had not filed a complaint, Minger answered, "Because there was already so much conflict with Christie Plinski, I did not want to exacerbate it." *Id.*

Plinski. Dkt. 40-4 at 2.[5] Minger also stated that Plinski's behavior was "horrendous" and gave examples of her "trying to surreptitiously take over all college room scheduling, of trying to gain authority to kick instruction out of classrooms, or trying to take over athletics and get Kim Hyattt moved out of a job." *Id.* According to Minger, "some sort of mediation is needed." *Id.* Minger sent another email about Plinski to Mr. Brown on March 4, 2013, stating that his "role has been bypassed, [his] input not sought" and that he had "been excluded from communications directly involved with [his] duties." Dkt. 40-3 at 6.

Minger testified that "[t]he triggering event" for his reports to Mr. Brown "had been that two of [Minger's] direct reports, Robert Cox and John Hamblin, had come to [him], distraught over how Christie Plinski had treated John Hamblin at an Instructional Administrators meeting." Dkt. 30-1 at 4. According to Minger, "John Hamblin described it as the worst he'd ever been treated in his whole career." *Id.* Minger felt that the complaints by those under his direct management required him to make a formal complaint about Plinski. According to Minger, his own experience of "ongoing harassment for over a year at that point" was one thing; but complaints by those he managed about "now being treated so poorly" by Plinski were quite another. *Id.* Minger believed that his own failure to report such incidents "would have violated college policy" because administrative regulations require witnesses to report "bullying." *Id.*

Mr. Brown forwarded Minger's emails to Ms. Blessing. Ms. Blessing stated in a letter to Plinski, dated August 13, 2013, that in response to Minger's allegations, Ms. Blessing had begun an investigation. According to Ms. Blessing, she met with Minger on March 28 and April 3, 4, and 5, 2013. Ms. Blessing found that Minger could not "provide details related to his allegations

---

[5] Minger asserts that he made other complaints about Plinski in February 2013. Neither party has made these complaints part of the record on summary judgment, but Minger's March 3, 2013 email states that he "wanted to write a kinder sort of message, too," alluding to earlier emails to Mr. Brown. Dkt. 40-4 at 2.

to a majority of Ms. Blessing's questions." Dkt. 40-3 at 33. Minger did not complete a

questionnaire about the alleged bullying. After interviewing multiple employees, including Mr.

Cox and Mr. Hamblin, Ms. Blessing found no misconduct by Plinski.

## C. **MHCC's Anti-Bullying Policy**

MHCC's Administrative Regulation AR-1100-A states that MHCC has "specific

procedures designed to maintain an atmosphere free of bullying, discrimination and harassment

and one that allows for free and effective communication between individuals." Dkt. 39-6 at 1.

Anyone at MHCC who experiences bullying or discrimination is "urged to contact the College's

Affirmative Action Officer or the appropriate administrator of the College to facilitate resolution

of such complaints." *Id.* Any retaliation in response to complaints "is expressly prohibited." *Id.*

The regulation defines "bullying" as follows:

> [R]epeated, unreasonable, inappropriate behavior or infliction of
> verbal or written abuse, such as the use of derogatory remarks,
> insults, and epithets; verbal, written or physical conduct that a
> reasonable person would find threatening, intimidating or
> humiliating; and the gratuitous sabotage or undermining of an
> employee's work performance or creates a risk to health and safety
> of any employees, group of employees, or students. Covert
> bullying includes subtle intimidation that undermines, treats less
> favorably or disempowers others.

*Id.* at 1-2.

The regulation also states:

> Individuals in positions of authority such as faculty, administrators,
> managers and coaches are legal agents of the College. A person in
> a position of authority who is made aware of, or in the exercise of
> reasonable care should have known of a violation of this regulation
> by a person under their authority or supervision and fails to take
> appropriate action is also subject to disciplinary action and may be
> subject to legal action.

*Id.* at 2-3.

Board Policy 1100 cites multiple Oregon and federal statutes in support of its statement that "[i]t is against district policy for any manager, supervisor, faculty, staff or student to engage in bullying, harassment or discrimination of any member of the College community based on but not limited to race, color, religion, ethnicity, national origin, age, sex, marital status, disability or sexual orientation." *Id.* at 6-7.

On March 12, 2012, MHCC Director of Labor Relations, Mary Elizabeth Harper, emailed MHCC staff, including Minger and Plinski, to inform them that "bullying" violates state and federal laws. Ms. Harper sent the email regarding a "student of concern." Dkt. 39-4 at 1. According to Minger, the email reinforced his belief that bullying violated state law, rules, or regulations.

D. **Elimination of Minger's Position**

Looking to make cuts in March 2013, Hay told Minger that he was looking to eliminate a manager in Minger's department and asked Minger for volunteers from his department for layoffs. Minger, however, did not volunteer anyone. According to Minger, Hay threatened that Minger's position would be considered for elimination during the reorganization.

Around the same time that Hay discussed layoffs with Minger, Hay asked his team to survey other community colleges in Oregon to find out whether those colleges had separate positions for Vice President of Instruction, the position Plinski held, and Vice President of Student Success and Enrollment Management, the position Minger held. The surveys showed that although some community colleges had both of these positions, Portland-area community colleges did not; these colleges combined the responsibilities for student services and instruction into one vice president position.

In March 2013, Hay eliminated Minger's position of Vice President of Student Services and Enrollment Management. Ms. Blessing's handwritten notes, dated March 12, 2013, describe

PAGE 8 – OPINION AND ORDER

a discussion between Hay and "Bill" (presumably Bill Farver, who became Vice President of Administrative Services) about eliminating Minger's position. The notes mention a "[b]ullying complaint." Dkt. 40-3 at 7. Ms. Blessing also wrote notes on the email from Plinski concerning Minger's behavior. The notes state: "Reorg—not a reason/backup plan." Dkt. 40-3 at 8.[6]

After the elimination of Minger's position, the Office of Instruction and Student Services underwent reorganization. Hay replaced Minger's position with an associate vice president position (titled "Associate Vice President of Student Success and Enrollment Management"), that Robert Cox, former Dean of Students, filled. Hay also assigned some of the duties of Minger's eliminated position to Plinski. Her title changed to "Vice President of Instruction and Student Services." Dkt. 29-7 at 2. Ursula Irwin, the Associate Vice President of Instruction, took on a greater role in management of instruction. MHCC also reassigned Ms. Blessing and another female employee, Sherry Mosher, during the reorganization with no competitive hiring process.

In addition to eliminating Minger's position, MHCC eliminated the positions of Manager of Benefits and Payroll Systems (held by a woman, Debbie Leingang), Manager of Advising, Retentions and Testing Services (held by a man, Luis Juarz), and Manager of Custodial Services (held by a man, Lance Belnap). *See* Dkt. 3902 at 2. In a letter to MHCC staff, Hays explained that the eliminations "were driven by the need to enhance operating efficiencies and address budget issues." Dkt. 29-7 at 2. The elimination of these four management positions, in addition to restructuring Student Services, Human Resources, and Facilities, resulted in savings of $380,000.

---

[6] The notes do not identify the author. At oral argument on February 2, 2016, however, the parties agreed—for purposes of summary judgment—that Ms. Blessing wrote the notes dated March 12, 2013, and the notes on Plinski's email.

On April 5, 2013, Minger received a formal letter from Hay advising Minger that MHCC was eliminating the position of Vice President of Student Success and Enrollment Management. Dkt. 39-1 at 1. The letter referenced a conversation regarding the matter that had occurred the previous month. The letter also informed Minger that although MHCC did not require him to perform his normal job duties so that he could have "greater flexibility" in his job search, MHCC would continue to pay his salary for three months. Dkt. 33 at 1.

Minger asked if MHCC would reassign him to a position as customer service coordinator or program leader in the IT Department. Minger testified that he believed he had the qualifications for these positions because of his experience installing and using some software programs, including student information systems. MHCC denied his request for reassignment. In response to questions about why MHCC did not consider Minger for the combined position of Vice President of Instruction and Student Services, Hay testified that MHCC decided to create that position after the college had already laid off Minger. After the elimination of his position, Minger took another full-time job at Klamath Community College ("KCC") as Vice President of Student Affairs. Although his annual salary at MHCC had been $116,000, his salary at KCC was $75,000.

During the reorganization, MHCC eliminated the positions of Vice President of College Advancement, Vice President of Information Technology, and Vice President of Research, Planning and Institutional Effectiveness. The female employee who held the position of Vice President of College Advancement, Cassie McVeety, voluntarily vacated her position. The male employee who held the position of Vice President of Information Technology, Jay Crowthers, left his position, and a woman replaced him as Chief Information Officer. It is unclear why the female employee who held the office of Vice President of Research, Planning and Institutional

Effectiveness, Nancy Szofran, left her position, but MHCC did not fill Ms. Szofran's position

after she left.  By May 2013, MHCC had three vice president-level positions. Women held two

of the positions, and a man held the third position. MHCC had two associate vice president

positions, one held by a woman and the other held by a man.

In May 2015, approximately two years after eliminating Minger's vice president position,

MHCC invited applications for the position of Vice President of Student Development and

Success. The job description exactly matched Minger's former job responsibilities with the

exception of two new responsibilities. The position's top annual salary was $41,245 more than

Minger made at MHCC.

## DISCUSSION

### A.  Retaliation Claims under § 659A.199 and ORS § 659A.203

ORS § 659A.199 provides that an employer may not "retaliate against an employee . . .

for the reason that the employee has in good faith reported information that the employee

believes is evidence of a violation of a state or federal law, rule or regulation." ORS § 659A.203

bars a public employer from "[p]rohibit[ing] any employee from disclosing, or tak[ing] or

threaten[ing] to take disciplinary action against an employee for the disclosure of any

information that the employee reasonably believes is evidence of," among other things, "[a]

violation of any federal or state law" or "[m]ismanagement, gross waste of funds or abuse of

authority or substantial and specific danger to public health and safety resulting from action of

the state, agency or political subdivision." ORS § 659A.203 also prohibits public employers from

attempts to "[d]iscourage, restrain, dissuade, coerce, prevent or otherwise interfere with

disclosure or discussions described in this section."

To establish a prima facie case under either statute, "a plaintiff must show that he

(1) engaged in a protected activity, (2) suffered an adverse employment decision, and (3) there

was a causal link between the protected activity and the adverse employment decision."

*Neighorn v. Quest Health Care*, 870 F. Supp. 2d 1069, 1102 (D. Or. 2012); *Shepard v. City of Portland*, 829 F. Supp. 2d 940, 965 (D. Or. 2011).

### 1.   Applicability of ORS § 659A.199

The parties do not provide, and the Court has been unable to find, any Oregon appellate decision specifically addressing the question whether a plaintiff may bring claims under both ORS § 659A.199 and ORS § 659A.203 against a public employer. Courts in this district, however, have concluded on multiple occasions that "[t]he Oregon legislature enacted ORS § 659A.199 in 2009 to extend 'whistleblowing' protections to private sector employees." *Neighorn*, 870 F. Supp. 2d at 1101 (D. Or. 2012); *see Peters v. Betaseed, Inc.*, 2012 WL 5503617, at *4 (D. Or. Nov. 9, 2012) (distinguishing between ORS § 659A.203, "which applies to public employers," and ORS §659A.199, under which the plaintiff properly brought a claim against a private employer); *Grosz v. Farmers Ins. Exch.*, 2010 WL 5812667, at *7 (D. Or. Nov. 9, 2010), *report and recommendation adopted*, 2011 WL 587555 (D. Or. Feb. 10, 2011) (noting that ORS § 659A.199 "impose[s] liability for whistleblowing discrimination by private employers"). This Court also has previously held that a former employee could not bring a claim against a public employer under ORS § 659A.199. *Lindsey v. Clatskanie People's Util. Dist.*, 2015 WL 6443290, at *11 (D. Or. Oct. 23, 2015) ("The legislative history establishes that ORS § 659A.199 does not apply to public employers.").

On October 21, 2015, the Oregon Court of Appeals decided *Hall v. Oregon*. 2015 WL 6164436 (Or. App. Oct. 21, 2015). In that case, the appellate court reversed the trial court's dismissal of the plaintiff's three whistleblower claims under ORS § 659A.199, ORS § 659A.203, and ORS § 659A.230. One of the defendants, the Oregon Youth Authority, was a public employer. The court did not specifically address the question whether a plaintiff may bring

claims under both ORS § 659A.199 and ORS § 659A.203 against a public employer. Because

the court reversed summary judgment on both claims, the answer could impliedly seem to be

"yes." The court, however, stressed that unlike ORS § 659A.199, ORS § 659A.203 "is addressed

specifically to public employers" and protects public employees "only for '*objectively* reasonable

whistleblowing.'" 2015 WL 6164436, at *4 (quoting *Love v. Polk Cnty. Fire Dist.*, 209 Or.

App. 474, 492 (2006)) (emphasis in original). In contrast, ORS § 659A.199 requires only that an

employee have "a subjective, good faith belief" that he or she is reporting unlawful conduct. *Id.*

at *5.

In its decision, the *Hall* court cited *Love*, 209 Or. App. 474, a case concerning the

requirements of a different whistleblower statute, ORS § 659A.233 (formerly ORS §

659.035(1)). The *Hall* court stated that it saw "no reason to distinguish [the good faith standard

in ORS § 659A.199] . . . from the good faith standard in ORS 659A.233." 2015 WL 6164436, at

*4. The *Love* court found a "striking" difference between ORS § 659A.203 and ORS §

659A.233. 209 Or. App. at 492. The court in *Love* emphasized:

> [T]he legislature knew how to specify a 'good faith' threshold, but
> it did not do so. Rather, the content and design of
> ORS 659A.203(1) evince a conscious policy choice to strike a
> different balance, in this context, between the competing interests
> that we addressed in *McQuary* [a case involving reports of
> significant violations of a patient's statutory rights, *see McQuary v.
> Bel Air Convalescent Home, Inc.*, 69 Or. App. 107, 111 (1984)].
> That is, the legislature intended that the "threshold" for the
> generality of public employee whistleblower claims be different,
> and more demanding, than with respect to whistleblowing claims
> based on reports of patient abuse.

*Id.* The *Hall* court similarly found that threshold requirements of ORS § 659A.203 and ORS

§ 659A.199 differed. 2015 WL 6164436, at *4.

As the Oregon Court of Appeals has repeatedly noted, the Oregon legislature

intentionally omitted the good faith standard found in other whistleblower statutes from the

public employer whistleblower statute. In contrast, the Oregon legislature included the good faith

standard in ORS § 659A.199, enacted after ORS § 659A.203. The legislature also omitted the

word "public" from ORS § 659A.199. *See Hearing on H.R. Bill 3162A before the S. Comm. on

Commerce & Workforce Development*, 75th Legis. Assemb. (Or. 2009) (statement of Rep. Judy

Steigler) (stating that the bill codified as ORS § 659A.199 "bring[s] private employees more in

line with the remedies available to them—would be available to them as public employees").

The differences between the two statutes indicate that the legislature specifically intended

different threshold requirements to apply to whistleblower claims in the public and private

sectors. It would therefore make little sense to subject a public employer to competing

requirements by allowing a plaintiff to bring claims under both ORS § 659A.199 and ORS

§ 659A.203.

A public employer is "[t]he state or any agency of or political subdivision in the state"

and "[a]ny person authorized to act on behalf of the state, or any agency of or political

subdivision in the state, with respect to control, management or supervision of any employee."

ORS § 659A.200(3). MHCC is a public community college and receives a large portion of its

funding from the State of Oregon. *See* Dkt. 29-3 at 20. Additionally, by alleging a violation of

ORS § 659A.203, Minger concedes that MHCC falls under the definition of "public employer."

Because ORS § 659A.199 does not apply to public employers, Minger cannot bring this claim

against MHCC.

### 2. ORS § 659A.203

#### a. Protected Activity

As a threshold matter, the Court must decide whether Minger's reports of Plinski's

behavior constitute "disclosures" and thus could potentially qualify as protected activity under

ORS § 659A.203. In *Bjurstrom v. Oregon Lottery*, the Oregon Court of Appeals held that

"disclosure" under the whistleblower protection statute includes a report made within an agency or a department. 202 Or. App. 162, 169-71 (2005). Nonetheless, Defendants argue that Minger's reports are not protected under the statute for two reasons: (1) Minger did not report a "violation of any federal or state law, rule or regulation," ORS § 659A.203(1)(b)(A); and (2) the "mismanagement" and "abuse of authority" Minger identified did not rise to the required level of seriousness to qualify for protection under the statute, ORS § 659A.203(1)(b)(B).

Minger argues that he had an objectively reasonable basis for believing that bullying constituted a violation of a federal or state law, rule, or regulation. ORS § 659A.203 "requires an objectively reasonable basis for the report based on information known to the employee at the time of the claim." *Hall*, 4452015 WL 6164436, at \*4. In *Hall*, the plaintiff reported to the police that a juvenile at the Oregon Youth Authority had slipped poison into his beverage when he turned his back. The Oregon Youth Authority fired the plaintiff when his report proved false. A surveillance video clearly showed that no one had touched the plaintiff's beverage during the time he asserted that he was poisoned. The court concluded, however, that the "plaintiff presented evidence to create a genuine issue of material fact that he . . . had an objectively reasonable belief for purposes of ORS 659.203 that someone had tampered with his bottle." *Id.* at \*5. To make this determination, the court looked only to what the plaintiff "knew at the time" of his report. *Id.*

MHCC argues that the "objectively reasonable" standard applies only to a plaintiff's *factual* mistakes, rather than *legal* mistakes. Therefore, argues MHCC, if the conduct complained of did not violate the law, Minger's reports do not qualify as "disclosures" no matter how

reasonable his beliefs were. Oregon appellate courts have not specifically opined on the issue.[7] In

the context of a retaliation claim under Title VII, however, the Ninth Circuit has explained:

> The reasonableness of [a plaintiff's] belief that an unlawful
> employment practice occurred must be assessed according to an
> objective standard—one that makes due allowance, moreover, for
> the limited knowledge possessed by most Title VII plaintiffs about
> the factual and legal bases of their claims. We note again that a
> *reasonable* mistake may be one of fact or law.

*Moyo v. Gomez*, 40 F.3d 982, 985 (9th Cir. 1994) (emphasis in original). In the absence of any

Oregon appellate case to the contrary, the Court follows *Moyo* and considers the objective

reasonableness of any mistake made by Minger—whether one of fact or law—regarding the

lawfulness of the alleged conduct he reported.

At the time of Minger's March 2013 reports to Mr. Brown, Minger knew of the

March 12, 2012 email from Ms. Harper, which informed MHCC staff that "bullying" violates

state and federal laws. Minger also asserts that he knew of MHCC's anti-bullying policies; those

policies, citing to Oregon statutes and administrative rules, state that anyone who fails to report

violations of the policies could be subject to disciplinary action and legal action. The policies

also characterize as "bullying" any "subtle intimidation that undermines, treats less favorably or

disempowers others." Minger reported to Mr. Brown what Minger perceived as "horrendous"

conduct by Plinski, including her attempts at "roadblocking" Minger's work and "exclud[ing]

[him] from communications" necessary for him to perform his duties. Viewed in the light most

favorable to Minger, these facts would allow a reasonable jury to conclude that Minger had an

---

[7] In *Love*, the court upheld the trial court's decision to grant summary judgment on the
plaintiff's whistleblowing claim because the plaintiff could "not identify any case, statute, rule,
or constitutional provision that compelled any of her [reports to her coworkers and supervisors.]"
209 Or. App. at 492-93. There, however, the "plaintiff admitted that she was completely
unfamiliar with what, if any, training standards were in place on the state, federal, or industry
level." *Id.* at 493. The plaintiff never asserted that she had any objective reason to believe that
the practices of which she complained violated the law.

objectively reasonable basis to believe that Plinski's conduct violated a federal or state law, rule, or regulation. This is all that the law requires on this point for withstanding a motion for summary judgment. *Hall*, 4452015 WL 6164436, at *5.[8]

Minger also argues that the conduct he reported to Mr. Brown rose to a level serious enough to qualify for protection under ORS § 659A.203. The court in *Bjurstrom* concluded that the term "disclosure" is subject to certain limitations when viewed in light of the legislature's intent that "the reported activity must rise in magnitude to a level of public concern in order for complaints about it to be protected." 202 Or. App. at 172.  For example, a "disclosure" does not include "a reaction to an apparently routine employment process, the results of which plaintiff did not approve." *Id.* at 174. A "disclosure" also does not include criticisms of "a temporary error." *Id.* To constitute a "disclosure," the report must concern conduct that "undermines the agency's ability to fulfill its mission." *Id.* at 172.

Minger's reports to Mr. Brown concerned another employee "deliberately roadblocking" Minger's efforts to perform his job. Plinski's behavior was having "quite an effect on [Minger]" and, according to Minger, persisted for over a year. Minger's belief that Plinski bullied two of his subordinates triggered his reports to Mr. Brown. In contrast to some of the conduct complained of in *Bjurstrom*, which included reports of practices such as selling decommissioned ladders, Minger's reports more closely resemble the *Bjurstrom* plaintiff's complaints about demeaning comments from a colleague. The court found that these comments could have "indicate[d] an inappropriate interaction" rising to the level of mismanagement if the employer had not "quickly remedied" the situation. *Id.* at 174. MHCC did not quickly remedy the situation

---

[8] Because the Court concludes that a jury could find that Minger had an objectively reasonable belief that MHCC violated a federal or state law, rule, or regulation, the Court need not decide whether "bullying" or the conduct described by Minger is in fact unlawful.

involving Plinski, as there is no evidence that MHCC held any mediation that Minger requested. Minger has created a genuine issue of material fact regarding whether his comments concerned MHCC's "ability to perform its function." *Id.* 174.

### b. Causal Link

Defendants do not dispute that Minger suffered an adverse employment decision when MHCC eliminated his position. The Court must still decide, however, whether a causal link existed between the protected activity and the adverse employment decision. The question "[w]hether an employer who discharged an employee was motivated by an impermissible reason is a question of fact." *Huber v. Or. Dep't of Educ.*, 235 Or. App. 230, 240 (2010). Under Oregon law, to meet the causation element, a plaintiff must establish that his or her protected activities "were substantial factors in defendants' adverse employment decision." *Id.* at 241.

Protected activity satisfies the substantial factor test if the activity is "'a factor that made a difference' in the discharge decision." *Estes v. Lewis & Clark Coll.*, 152 Or. App. 372, 381 (1998) (quoting *Nelson v. Emerald People's Util. Dist.*, 116 Or. App. 366, 373 (1992), *aff'd in part, rev'd in part*, 318 Or. 99, 862 (1993)). Oregon courts have construed the substantial factor test as a "but for" standard. *See, e.g.*, *Joshi v. Providence Health Sys. of Or. Corp.*, 198 Or. App. 535, 539 (2005), *aff'd*, 342 Or. 152 (2006) ("When employed as a standard for determining cause-in-fact, the phrase 'substantial factor' generally does not eliminate the concept of 'but-for' causation."); *Hardie v. Legacy Health Sys.*, 167 Or. App. 425, 435-36 (2000), *superseded by statute on other grounds as stated in Lansford v. Georgetown Manor, Inc.*, 192 Or. App. 261, 275 n.2 (2004) (concluding that the plaintiff raised a genuine issue of material fact regarding whether the defendant would have fired her "but for" her protected activity). Close temporal proximity of an employee's protected activity and the termination of employment may serve as

circumstantial evidence that the protected activity was a substantial factor in the adverse

employment decision. *Herbert v. Altimeter, Inc.*, 230 Or. App. 715, 724-25 (2009).

Here, Minger reported Plinski's behavior in March 2013. MHCC eliminated his position

that same month and refused to reassign Minger to another position at the college. Before

Minger's complaint, Hay had not informed Minger that MHCC was considering eliminating the

position of Vice President of Student Success and Enrollment Management. Furthermore, Ms.

Blessing's notes about Minger mention a bullying complaint, although it is unclear whether this

is Minger's complaint about Plinski or Plinski's complaint about Minger. Dkt. 40-3 at 7. Finally,

Ms. Blessing's notes also suggest that reorganization was "not a reason" for the elimination of

Minger's position. *Id.* at 8. Taken together, this evidence could allow a reasonable jury to find

that Minger's bullying complaint constituted a substantial factor in MHCC's adverse

employment decision.

## B.  Sex Discrimination Claims under Title VII and ORS § 659A.030

Minger asserts that MHCC reorganized positions based on gender and did not take

appropriate action to prevent and promptly correct discriminatory treatment of Minger.

According to Minger, the reorganization resulted in the disproportionate retention and promotion

of females, resulting in disparate treatment of male employees such as Minger. MHCC responds

that Minger cannot show that the college treated similarly situated females more favorably or

that the reorganization favored women.

Under Title VII, it is "an unlawful employment practice for an employer . . . to

discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2. ORS

§ 659A.030 makes it unlawful "[f]or an employer, because of an individuals . . . sex . . . to refuse

to hire or employ the individual or to bar or discharge the individual from employment." Because

Oregon modelled ORS § 659A.030 after Title VII, courts analyze the claims together. *See, e.g.*, *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1437 n.2 (9th Cir. 1993) ("Courts construe Oregon's statutory counterpart, [ORS] § 659.030 (1992), as identical to Title VII.").

Although federal courts and Oregon state courts "have adopted different methodologies for evaluating evidence in disparate treatment claims," federal and state disparate treatment claims ultimately require an answer to the same question: "Whether, on the record as a whole, the evidence permits a reasonable inference that the plaintiff was the victim of intentional discrimination." *Durham v. City of Portland*, 181 Or. App. 409, 421, 424 (2002). Any "differences in methodology lie more in form than in substance." *Id.* at 425.

Moreover, the Ninth Circuit has held that the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to ORS § 659A.030 claims tried in federal court, regardless of whether federal jurisdiction arises from diversity or supplemental jurisdiction. *Dawson v. Entek Int'l*, 630 F.3d 928, 935 (9th Cir. 2011) (holding that *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1090-93 (9th Cir. 2001)—which stated that *McDonnell Douglas* burden shifting, and not Oregon's "prima-facie only" rule, applies to Oregon Chapter 659A claims in federal court in diversity cases—"represents the law of this circuit and applies in all cases in federal district court in which the choice between federal and state procedural law is presented."). The Court thus analyzes Minger's claim under the federal framework to reach the ultimate question whether a reasonable jury could conclude that MHCC eliminated Minger's position because of sex discrimination.

To establish a Title VII prima facie case of disparate treatment under the federal *McDonnell Douglas* burden shifting framework, a plaintiff must show that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for his or her position and performing

the job satisfactorily; (3) the plaintiff suffered some adverse employment consequence; and (4) similarly situated individuals, outside of the plaintiff's protected class, were treated more favorably. *McDonnell Douglas*, 411 U.S. at 802. After a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a nondiscriminatory reason for the adverse employment action. *Id.* at 802.

If the defendant shows a nondiscriminatory reason, then the burden returns to the plaintiff to prove that the defendant's nondiscriminatory reason is mere pretext. *Id.* at 804. A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). A showing of pretext requires "'very little' direct evidence of discriminatory motive," but a case based on "circumstantial evidence" requires "'specific' and 'substantial'" evidence. *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1284 (9th Cir. 2001) (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998)). Additionally, in a disparate treatment case, "[p]roof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977); *see also Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993) ("Whatever the employer's decisionmaking process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome.").

### 1.  Minger's Prima Facie Case

MHCC does not dispute that Minger, as a male, belongs to a protected class. MHCC also does not dispute that Minger performed his job satisfactorily and that he suffered adverse employment consequences during the reorganization. MHCC disputes only the last element of

Minger's prima facie case, whether MHCC treated similarly-situated women more favorably than men. To meet this element of his prima facie case, Minger must show that other female employees received more favorable treatment and were similarly situated "in all material respects." *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006).

Minger asserts that MHCC eliminated the positions of more men than women during the reorganization process. Men held three out of the four vice president-level and manager-level positions eliminated by MHCC. Additionally, Minger asserts that Plinksi remained in her position and received additional responsibilities despite the reorganization and despite having less experience in higher education and student affairs than Minger. MHCC also reassigned Ms. Blessing and another female employee, Sherry Mosher, during the reorganization with no competitive hiring process, yet MHCC denied Minger the opportunity to move to an already-funded vacancy.

The only employee situated similarly to Minger in all material respects is Plinski. Ms. Blessing and Ms. Mosher did not hold vice president-level positions, and Ms. Mosher did not even hold a managerial-level position. Still, in contrast to its treatment of Minger, MHCC did not eliminate Plinski's position and gave her more responsibilities, including Minger's former responsibilities. Thus, one similarly-situated female employee did receive more favorable treatment than Minger.

### 2.  MHCC's Reasons for Terminating Minger

MHCC asserts that it eliminated Minger's position for budgetary reasons. According to Hay, the college did not offer Minger the opportunity to apply for the position of Vice President of Instruction and Student Services because MHCC had already laid off Minger by the time the college decided to create the new position. Survey evidence supports MHCC's contention that the college had too many vice president-level positions and needed to cut costs through

administrative reductions. These reasons constitute legitimate, nondiscriminatory reasons for terminating Minger's employment with MHCC. *See Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 661 (9th Cir. 2002), as amended (July 18, 2002) (holding that a reduction in workforce due to seasonal downturns constitutes a legitimate, nondiscriminatory reason for terminating an employee).

Because MHCC proffers legitimate reasons for laying off Minger, the burden now shifts back to Minger to put forth evidence that MHCC's nondiscriminatory reasons are really a pretext for sex discrimination. Minger asserts that MHCC did not truly eliminate his position but rather renamed it "Associate Vice President" and moved the position under the supervision of Plinski. MHCC assigned one of Minger's former male subordinates, Mr. Cox, to that position, and then just two years later, MHCC posted an opening for a position substantially similar to the one Minger formerly held. Minger also asserts that MHCC initiated a more robust response to Plinski's complaints that Minger bullied her than it did for Minger's complaints of Plinski's bullying.

Minger's evidence is circumstantial, and "in the context of summary judgment, Title VII does not require a disparate treatment plaintiff relying on circumstantial evidence to produce more, or better, evidence than a plaintiff who relies on direct evidence." *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1030 (9th Cir. 2006). Nevertheless, the circumstantial evidence Minger presents, even construed in the light most favorable to Minger, does not allow the inference that MHCC terminated Minger's employment because of his sex. Although Plinski received more favorable treatment than Minger, Minger's former responsibilities went, in part, to a man who previously reported directly to Minger. The reorganization also left Mr. Faver in one of the three remaining vice president-level positions. Men held half of the president or vice

president-level positions in May 2013. Finally, although Ms. Blessing's notes state "Reorg—not

a reason," the evidence suggests that the most likely wrongful motive, if there was a wrongful

motive, on the part of MHCC arose from Minger's reports of bullying rather than his sex. Minger

has not presented evidence showing that a discriminatory motive more likely motivated MHCC

or that MHCC's proffered reasons are not worthy of credence.

## C.  42 U.S.C. § 1983 Claim

Minger asserts that Defendants deprived him of his constitutional rights in violation of

the Equal Protection Clause of the Fourteenth Amendment.[9] A plaintiff may use 42 U.S.C.

§ 1983 to remedy a violation of the Equal Protection Clause. *Lee v. City of L.A.*, 250 F.3d 668,

686 (9th Cir. 2001). In general, to establish a 42 U.S.C. § 1983 claim, a plaintiff must show: (1)

that the defendant violated a right secured by the Constitution or laws of the United States; and

(2) that a person acting under the color of state law committed the alleged violation. *West v.

Atkins*, 487 U.S. 42, 48 (1988); *Campbell v. State of Wash. Dept. of Soc. & Health Servs.*, 671

F.3d 837, 842 n.5 (9th Cir. 2011). To state a claim for a denial of equal protection, "a plaintiff

must show that the defendants acted with an intent or purpose to discriminate against the plaintiff

based upon membership in a protected class." *Lee*, 250 F.3d at 686 (quoting *Barren v.

Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998)) (quotation marks omitted).

The Ninth Circuit has made clear that "the Equal Protection Clause proscribes purposeful

discrimination by state actors, in the workplace and elsewhere, based solely on an individual's

membership in a protected class." *Bator v. State of Hawaii*, 39 F.3d 1021, 1027-28

(9th Cir. 1994); *see Lindsey v. Shalmy*, 29 F.3d 1382, 1385-86 (9th Cir. 1994) (holding that

---

[9] In his response to Defendants' motion, Minger clarifies that he has not alleged a deprivation of procedural due process or substantive due process. Minger also asserts that he bases his § 1983 claim only on intentional discrimination in violation of the Equal Protection Clause.

denial of a promotion, adverse alteration of job responsibilities, and other hostile treatment are clear violations of the Equal Protection Clause). In *Bator*, the Ninth Circuit also explained that sex discrimination claims brought under both Title VII and the Equal Protection Clause "address the same wrong: discrimination," but are different because "a plaintiff must show intentional discrimination and state action for equal protection claims (but not for Title VII claims)." 39 F.3d at 1028 n.7.

The "intentional discrimination" requirement for an equal protection claim is in addition to the "personal participation" requirement applicable to all § 1983 claims. *Giba v. Cook*, 232 F. Supp. 2d 1171, 1179 (D. Or. 2002) (quoting *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)) (quotation marks omitted). A defendant participates when the defendant "does an affirmative act, participates in another's affirmative acts, or omits to perform an act which [that person] is legally required to do that causes the deprivation of which complaint is made." *Preschooler II v. Clark Cnty. Sch. Bd. of Trustees*, 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)) (quotation marks omitted). The Ninth Circuit explained that a plaintiff may establish the requisite causal connection by showing that a defendant "set[] in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Tibbetts v. Kulongoski*, 567 F.3d 529, 539 (9th Cir. 2009) (quoting *Johnson*, 588 F.2d at 743). Therefore, Minger must establish his prima facie sex discrimination claim and show that defendants intended to and did participate in the discrimination in order to show a violation of his equal protection rights.

As discussed above, the evidence presented establishes that after MHCC eliminated Minger's position, men occupied two of the four president or vice president-level positions. A male employee took on some of Minger's former responsibilities under the title of Associate

Vice President of Student Success and Enrollment Management. Defendants have also presented evidence that budgetary concerns motivated the decision to eliminate Minger's position. Further, Minger has shown that his own bullying complaints better explain his termination than sex discrimination, if there was a wrongful motive. The only evidence that gender motivated any decision MHCC, Hay, or Plinski made is Plinski's more favorable treatment. This one instance of a similarly-situated female receiving more favorable treatment does not suffice to show intentional sex discrimination in violation of the Equal Protection Clause. Minger has not created a genuine issue of material fact regarding whether MHCC, Hay, or Plinski acted with an intent or purpose to discriminate against him based on his sex.

Hay and Plinski also argue that they are entitled to qualified immunity. A plaintiff may not recover money damages from an individual state official unless a plaintiff shows "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). An "official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Id.* at 2083 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (alterations in original). There need not be case law "directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* This doctrine "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Id.* at 2085. A court has discretion to decide which of the two prongs of the qualified immunity analysis to address first. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Minger asserts that any reasonable official would have known that terminating a person because of his sex violates the Constitution. The right to be free of sex discrimination in the workplace, argues Minger, has been clearly established since the passage of the Civil Rights Act of 1964. Because the Court finds no constitutional deprivation, however, the court need not reach the question whether Hay and Plinski violated a clearly established right.

## CONCLUSION

Defendants' Motion for Summary Judgment (Dkt. 27) is DENIED IN PART and GRANTED IN PART. The Court DENIES the motion with respect to Plaintiff's claim against Defendant MHCC under ORS § 659A.203. The Court GRANTS the motion on all other claims.

**IT IS SO ORDERED**.

DATED this 4th day of February, 2016.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge